## MATTER OF THE GRADUATES.

*Court of Appeals; November Term,* 1860.

ATTORNEYS.—ADMISSION TO THE BAR.—APPEAL.—CONSTITU-
TIONAL LAW.

Where any power is conferred upon a court of justice to be exercised by it as a
court, in the manner and with the formalities used in its ordinary proceedings,
the action of the court may be regarded as *judicial*, irrespective of the original
nature of the power.

Whenever the law confers a right, and authorizes an application to a court of jus-
tice to enforce that right, the proceedings upon such application must be re-
garded as *judicial*.

An application for admission to practise as an attorney, is a remedy of the class
of special proceedings; and an appeal lies to the Court of Appeals from an
order of the court denying such application.

The statute of 1860,—providing that any graduate of the Law School of Colum-
bia College shall be admitted upon his diploma to practise,—is not unconsti-
tutional. On a fair construction, it has reference only to the requisite qualifi-
cations of learning and ability, and does not necessarily assume to dispense with
the constitutional requirements as to age, sex, &c.

The power of the Supreme Court over the admission of attorneys, is not beyond
the control of the Legislature.

An admission of attorneys is not appointment to office within the meaning of the
Constitution.

Appeal from an order of the Supreme Court, denying an ap-
plication of the graduates of Columbia College Law School,
for admission to practise as attorneys.

By the act entitled "An act relative to the Law School of
Columbia College," passed April 7, 1860, it was enacted, that
the professors in the Law School of Columbia College, and the
law committee of the trustees of said college, are constituted

a committee, any three of whom, being counsellors at law, shall form a quorum, upon whose examination and recommendation, as evidenced by the diploma of said college, granted upon such recommendation, any graduate of said Law School shall be admitted to practise as an attorney and counsellor at law, in all the courts of this State; and that no diploma shall be sufficient for such admission, which is given for any period of attendance upon the said school for a term less than eighteen months; but this period of eighteen months shall not apply to the members of the present senior class in said Law School, who may be admitted to practise as aforesaid upon the examination and recommendation of said committee, and upon the evidence of the diploma of the college.

Under this act, several graduates of the Law School applied to the Supreme Court in the first district to be admitted to practise.

An application of the graduates of the Law School of the New York University was made about the same time, under a similar statute relating to that institution. Both applications were denied. The opinions of the court are reported, 10 *Ante*, 387. From the orders entered, appeals were taken to the Court of Appeals. That in the case of the Law School of Columbia College was argued by

*Theodore W. Dwight*, of the faculty of the Law School. I. The order is appealable.

1. This motion is a proper remedy. This would be so at common law. *Ubi jus, ibi remedium.* There is no distinct remedy by action which would clothe the appellant with the right to practise. A mandamus will not lie to the Supreme Court. Besides, as an admission to the bar by the court is a judicial act (see Commonwealth *on rel.* Brackinridge *a.* Common Pleas, 1 *Serg. & Rawle*, 187 ; *Exp.* Secombe, 19 *How.* (*U. S.*), 15), a mandamus cannot, on recognized principles, be granted. There is no way in which the appellant can be admitted, except by an order of the court. An application for an order is a motion. Attorneys are admitted upon motion by the court. (*Exp.* Stokes, 1 *Chit.*, 556 ; *Exp.* Rowle, 2 *Ib.*, 61 ; *Laws of* 1847, ch. 280, § 75.) However this may be at common law, this motion is a remedy under the Code. Every

original application to a court of justice for a judgment or an order is a remedy. (Belknap *a.* Waters, 1 *Kern.*, 477.)

2. This is a special proceeding. It cannot be an action. (Hyatt *a.* Seely, 1 *Kern.*, 52; Belknap *a.* Waters, *Ib.*, 478.)

3. The order is therefore appealable under section 11, subdivision 3, of the Code. It is an actual determination of the court. Whatever the court does in that capacity is judicial. (Matter of Canal and Walker streets, 2 *Kern.*, 406.) A statute may confer a power upon a court, which it will at once proceed to exercise in the same manner as it exercises jurisdiction granted by the Constitution. It uses all the ordinary machinery of the court in such a case; requires the services of its officers and the buildings appropriated to its ordinary business. The powers incident to its general jurisdiction, so far as applicable, attach at once to the new subject. (*Ib.*, 411.) An admission to the courts is clearly a judicial act. (See the cases previously cited from Chitty, also 2 *W. Black.*, 734; *Exp.* Smith, 7 *Dowl. & Ryl.*, 382; 1 *Serg. & Rawle*, 187, 193, 195.) The order of admission becomes a record, and of so high a nature, that the only way of testing it is by the plea of *nul tiel record.* (*Merrifield's Law of Attorneys*, 29.)

Section 75 of the judiciary act expressly provides that a candidate, applying to be admitted to practise, shall be examined by the justices of the Supreme Court at a general term thereof; and if found qualified, &c., the court shall direct an order to be made by the clerk thereof, stating that such person has been so examined and found to possess the qualifications, &c. The admission takes place by the court, in its ordinary course of action; it requires the services of its officers; the order is to be entered by the clerk in the usual way.

The act of 1860 is *in pari materia* with the judiciary act, and must be construed in connection with it. The admission is, to all appearances, to take place in the same manner. The court, in hearing this motion, in rejecting it, and in directing an order to be entered to that effect, manifestly acted as a court. Moreover, in the present case, the court expressly assume to act as such, and rest the denial of the motion upon the ground that there is not sufficient legal evidence before them. The act, moreover, makes the diploma evidence, showing the matter to be judicial.

The order made is final, and disposes of the whole subject.

The Constitution, the judiciary act, and the law of April 7, 1860, show that a right has been affected. A person having certain qualifications is entitled to an admission to practise in all the courts of this State, and has, therefore, a right to be admitted. Wherever a court is bound to decide *ex merito justitiæ*, error will lie. (Evans *a.* Adams, 3 *Green.* (*N. J.*), 373.)

This right is substantial. The appellant has rights under the law of April 7, 1860, which he has not under the judiciary act alone, and under the rule of the court. Under the law, he can be admitted at any time; under the rule, only during two terms of the year. Under the rule, he can only make his application in the district where he resides; under the law, he can be admitted in any district. If the decision be not reversed, he must lose, for six months, the right to practise.

Striking an attorney off the roll, without cause, cannot be distinguished, in principle, from refusing to admit one who shows himself entitled to an admission. A writ of error will lie in favor of an attorney who has been wrongfully removed from office by the court below. (Strother *a.* The State, 1 *Missouri*, 605; *Exp.* Secombe, 19 *How.* (*U. S.*), 15.)

If this order be not appealable, a law may be pronounced unconstitutional on motion, without argument, and its effect nullified without any opportunity for review. The decision that a law is unconstitutional, is clearly an exercise of judicial authority. (Thomas *a.* Board of Commissioners, 5 *Indiana* (*Porter*), 4.)

Since this decision, the appellant cannot assume to act as an attorney, without an apparent contempt of court; nor can it be perceived how, by the very terms of the act, he can proceed without being admitted to practise.

The right of review being fundamental, is always presumed to exist. Even if there be an intention to take it away, it must be expressed with irresistible clearness. (Lawton *a.* Commissioners of Highways, 2 *Cai.*, 179–181; 3 *Hill*, 464, per COWEN, J.; Starr *a.* Trustees, 6 *Wend.*, 564.)

The rules of the common law cannot be followed strictly, since the Code, in determining the right of appeal. The only question is as to the meaning of the statute or Code. The former test, as to whether the proceedings were according to the course of the common law (Case of Cardiffe Bridge, 1 *Salk.*,

144–146; *Tidd's Pr.*, 1051), is no longer applicable. (Evans *a.* Adams, 3 *Green* (*N. J.*), 373; Belknap *a.* Waters, 1 *Kern.*, 477.)

There are cases, however, which, in principle, hold that this case would be appealable at common law. Thus it has been said, "wherever a decision upon a motion disposes finally of the case, a writ of error will lie." (Cavanaugh *a.* Titus, 5 *Wisconsin*, 144.)

II. This order ought to be reversed.

1. At common law the court had no power to appoint an attorney or counsellor.

2. The rules regulating the appointment of an attorney are merely statutory. This appears from the history of the English law. In this State, in the colonial period, attorneys were uniformly appointed by the governor. Judicial decisions, in this country, recognize the English rule. The power of the Legislature may also be derived from the nature of the case. Whether there should be any regulations on the subject at all, and if any, what they should be, is a question of public policy which the Legislature alone is competent to decide. It will be shown that attorneys, since the first statutes, have been treated as public officers, and their appointment, as such, has been regulated by the Legislature.

III. The act in question, entitled "An act relative to the Law School of Columbia College," is not unconstitutional. The provision on the subject in the Constitution was inserted, not to confer power upon the court, but privileges upon the citizen. The Constitution expressly withdraws from the court the power to appoint public officers, among whom attorneys are included. All the power which the court now possesses is simply to ascertain the qualifications of an attorney, and to enter an order stating that they are ascertained. The act makes the diploma of the college evidence of the existence of these qualifications, which is within the power of the Legislature. The word admission, in the Constitution, means only the power of entrance, and confers no authority upon the court. The contemporaneous construction of this provision by the Legislature in the judiciary act, upholds this law. If unconstitutional, the practice of the Supreme Court in admitting to all the courts, is itself objectionable. It is not a nugatory thing to admit one who is entitled by statute to admission, the object of the formal act

being to place his name upon the roll, to prove his title and to furnish the court with a more ready means of administering discipline. The clause in the Constitution affecting this question, was intended probably as a restraint upon the judiciary, and not upon the Legislature. If there be any objection to the law, because by its unguarded language it allows unqualified persons to be admitted (which is denied), it is only void to that extent.*

* The argument of the learned counsel upon this branch of the case embraces so exhaustive a view of the history and course of admission of attorneys, that we present it here at length.

I. The court, by common law, had no power to admit an attorney or counsellor to practise.

1. As to attorneys. It was the policy of the common law, in order that suits might not multiply and increase, that both plaintiff and defendant should appear in person in all actions, real, personal, and mixed, as well in courts of record as not of record. The old writs demanded that the defendants should appear, which was always in proper person. The justices sometimes allowed one to act for a party in his absence, provided that he was personally selected by such party in the presence of the court. Such a person was called a "*responsalis.*" There was no restriction as to the character of this person. A father could respond for a son, a foreigner for a foreigner, a husband for a wife. (*Glanville de Legibus*, bk. 11, ch. 3; 1 *Reeves' Hist. English Law*, 169.)

Lord Coke calls especial attention to the difference between a "*responsalis*" and an attorney. (2 *Coke's Inst.*, 249, 250, commenting on the statute of *Westm.* 2d.)

While the justices could not permit a person to appear by attorney, the king, by the plenitude of his prerogative, might appoint an attorney, and give any person a right to appear in this manner. Letters-patent would issue out of chancery, or under the privy seal, commanding the justices to admit such and such a person as attorney for another, in regard to the particular suit in question. This is a very early instance of a royal mandamus to the courts, commanding the courts to admit attorneys, &c. The words were "*mandamus ut admittatis.*" (See *Register of Writs*, 20–22; *Bacon's Abridgment*, tit. *Attorney*, par. 1.) These letters were usually granted for some special reason, such as absence and sickness, although the authority might be general, and was entirely at the pleasure of the king. (See *Co. Litt.*, 128, *a*, § 196; *Petersd. Abr.*, tit. *Attorney.*)

These writs continued to be used side by side with the statutes hereafter noticed. The Register contains a large number of forms of writs containing the words "according to the form of the statute in such case provided." One of them discloses a reason why they were applied for. The command is, that the justices admit the attorney "*sine difficultate.*" The judges apparently resisted the command of the statue, and this writ was devised to overcome their objections.*

Besides, as will be seen, the statutes did not extend, at first, to many cases, and the writs supplied, in individual instances, the defects of legislation.

* Says Lord Coke: "Here is a secret in law, that, upon any statute made for the common peace or good of the realm, a writ may be devised for the better execution of the same, according to the force and effect of the act." (3 *Inst.*, 162.)

Matter of the Graduates.

By·the Court.—Selden, J.—This is an appeal from an order made at a general term of the Supreme Court, in the first judicial district, denying the application of the appellant to be admitted to practise as an attorney and counsellor at law, pur-

Sometimes two or more general attorneys were appointed by letters-patent, with power to substitute others in their places, and with power reserved to the client to revoke the appointment. Such persons were often appointed to act during the absence or sickness of the client ; their authority ceasing on his return or recovery.

Heads of monasteries or religious houses were especially favored in this respect. One of the forms in the Register is so illustrative, that a translation of it is subjoined :—" The King, &c., to all to whom these presents may come, Greeting. Know Ye, that, whereas the lands and tenements of the Abbey of St. Peter of Gloucester lie in different counties of our realm, and far from the Abbey, and that frequently the Abbot is greatly entangled in lawsuits and vexed in different courts in said counties, by persons plotting to annoy him with labors and to overload him with expenses, because the said Abbot, on account of the distance of the lands and the dangers of the roads, cannot struggle through the prosecution of controversies concerning them without the greatest personal risk, and without ruinous cost, we having considered the premises, and wishing to do a special favor to the aforesaid Abbot,—cherishing, as we do, a spiritual affection for the church where our father Edward of blessed memory lies buried,—for ourselves and our heirs, grant to such Abbot for the whole time of his life, the power to make and constitute general attorneys for prosecuting and defending all pleas and complaints which may be moved for or against him in any courts whatever, and that the said attorneys, or any one of them who may be present, may make whomsoever they wish attorneys for prosecuting, and defending, &c. ; and the said Abbot may remove the general attorneys so appointed, as often as he may see fit, and appoint others. Let not this concession of ours be drawn into a precedent. By the King himself." (*Register of Writs*, 22.) This writ is especially interesting, as showing how corporations originally appeared, and how it happened that they appeared by attorney. The " special favor" alluded to in this writ was often exhibited, as there are fifteen different forms of showing it forth to be found in the Register.

This writ shows clearly that such an attorney was simply an attorney in fact.

It may be conjectured that the statutes, to be hereafter noticed, allowing attorneys, were passed to prevent the delays which were so common in ancient lawsuits. The distance of the land, the dangers of the road, the inconvenience of travelling, were all reasons why the old rule, which required the presence of the client at court, should be dispensed with. As soon as attorneys were allowed, there was no excuse for dèlay. Accordingly, in the first statute upon the subject, it was enacted that the previously recognized legal excuses for absence from court should be hereafter abrogated, and unless the tenant was present by attorney, the case should go by default. (*Statute of Westminster* 1st, ch. 42.)

In the absence of letters-patent, it is clear that attorneys could not exist at common law. Says the Mirror of Justices, "it is an abuse to have an attorney, except by writ, out of chancery." (No. 100 of *Abusions of the Law.*) Lord Coke adopts the sentiment. (2 *Institutes*, 250.)

suant to the provisions of the act relative to the Law School of Columbia College, passed April 7, 1860; and the first question to be considered, is whether an appeal will lie to this court from such an order.

---

2. Barristers or counsel were not, at common law, nor are they now, in England, admitted by the court. The barrister went to the bar by means of authority granted by the Inns of Court, which were voluntary associations and unincorporated. The judge could not require the benchers to add any persons to their number unless they saw fit, nor could barristers be created, as attorneys often were, by letters-patent. (*Pearce's Inns of Court*, 60. See *Fortescue de Laudibus*, Amos. ed., 182–188 ; 4 *Reeves' Hist. English Law*, 573, 574.) The Inns of Court resolved, at an early period, not to admit any attorneys to the degree of barristers, and to dismiss barristers if they practised as attorneys. (*Ib.*) The barrister assumed his gown without the acquiescence of anybody but the house to which he belonged. (*Pearce*, 52.) The discretion of the societies in admitting barristers is understood to be uncontrollable. (King *a.* Benchers of Lincolns' Inn, 4 *Barnwell & Cresswell*, 855.) It is well known that these associations have continued, down to the present day, to admit barristers, with a greater or less degree of stringency in the examinations. They are now sensibly increasing the requirements necessary for an admission. From them can be derived a commentary, running through a period of half a dozen or more centuries, upon the proposition that the qualifications of counsel can be ascertained without applying to the court to test their fitness.

II. The power of clients to appoint attorneys, and of the court to regulate their admission, is statutory in its character.

This will appear, 1, Historically. The power of clients to appoint their attorneys was conferred in England by Statute Westminster 2d (3 Edw. I., ch. 42), in certain cases. The object of this legislation was to confer the right to appear by attorney without applying to the king. In this way the king gave up fees which he used to possess, when he could command the justices to admit an attorney. (2 *Reeves' Hist. English Law*, 169 ; 2 *Coke's Institutes*, 377, 378 ; *Statute Westminster* 2d.) These acts extended to corporations by force of the word "*illi*" or "they ;" the language of the act being that *they* who have lands, &c., in litigation, may make an attorney. (2 *Coke*, 378.) In those cases to which the statute and succeeding acts did not extend, the courts were very rigid in applying the former rule. In the first act, three cases are mentioned, but one quite important was omitted— the action of novel disseizin, as it was termed. By 12 Edw. II. (ch. 1), it was enacted that the tenant in possession might appear by attorney in that action. In the Year Books (21 Edw. III., 41), a curious case is reported. The demandant appeared by attorney. Said SETON, J.—How can you appear by attorney, when you have nothing in the tenancy ? Counsel.—It is the common course, whether one is demandant or tenant. HILL, J.—At the common law, neither tenant nor demandant could appear by attorney, but only by bailiff. By statute it is ordained that a tenant can appear, but it is not ordained that a demandant can. The attorney was therefore excluded. Beecher's Case (8 *Coke*, 58), as well as many cases in the Year Books, hold it to be incompetent for a party to appear by attorney in a case to which the statutes did not extend. Judgment would go by default against a person who appeared in this manner without the authority of the

It is suggested, as an objection to the appeal, that such an application is not a judicial proceeding; that the power of appointing or admitting attorneys and counsellors is executive or administrative, rather than judicial, and' might be conferred

statute. In a case of detinue (*Year Book*, 9 Edw. III., 6), a party lost his case by appearing by attorney. (Also, Edw. II., 18.)

It was a well-recognized rule that parties could not appear by attorney where any personal service was to be expected; as, for instance, homage. (*Year Book*, 1 Hen. VII., 27.) This same principle, curiously enough, is found in the Laws of 1801, in this State. A party could not appear by attorney where corporal punishment might be inflicted as a result of the proceeding.

The character and qualifications of an attorney were not at all involved by these statutes. He was simply an attorney in fact. Any one could, by legal principles, be an attorney. The king might send a message to the court to receive such person as the party may name (*Fitz. N. B.*, 60, 61), and might make the grant either under his privy seal or great seal. The courts say in one case (*Year Book*, 21 Hen. VI., 30, in the Common Pleas), that by the rules of law an outlaw or an attainted clerk may be an attorney in a suit, though such persons could not themselves bring actions. The reason why they could appear as attorneys, was because they sued in *autre droit*. This case is so important, that it is stated somewhat at large. An action of debt had been brought by administrators. The defendant, by his counsel, said that he ought not to answer, because the plaintiffs were outlaws, as he could prove by the record. After a discussion by plaintiff and defendant, NEWTON, Ch. J., said, " Put the case that an executor is an outlaw; this does not deprive him of his right to administer upon the estate of the deceased, for an executor is, as it were, an attorney for the dead. And put the case that I sue a suit in this court by attorney, and he were an outlaw; this would be no plea against his right to proceed; or if an infant, by his *prochein ami*, should bring an action, it would be no defence that the *prochein ami* was an outlaw, because in both cases they sue in *autre droit*." PASTON, J., conceded this proposition; and FULTHORPE, J., while admitting its truth, held that the case of an executor was not parallel to that of an attorney. The Index states that an outlaw or an attainted clerk may be an attorney. This case shows that it was perfectly understood that an attorney merely stood in the place of his principal, like a *prochein ami* for an infant, and accounts for the fact that the old appointments made by the king usually allege absence from the realm, sickness, and engrossing occupations, as a reason for the selection. The attorney was appointed on account of a disability on the part of his principal. The case of an attorney must have been exceedingly clear, or Justice Newton would not, in endeavoring to set forth the power of an executor, have resorted to an analogy so imperfect as to call him an "attorney for the dead."

A married woman could be an attorney for her husband in a suit. (*Fitz. N. B.*, 63.) Attorneys were appointed by authority emanating from their "master" (3 *Reeves' Hist.*, 233), as the client was then called, and by warrant of attorney. This warrant must be produced as early as the day of trial, or else it was a case of error. (8 Hen. IV., 62.) An attorney could never plead the misnomer of his master, contrary to the warrant, but might plead that he had an additional name. (2 Hen. VI., 11; 3 *Ib.*, 55.) In many kinds of actions the warrant of attorney,

upon any other branch of the government as well as upon the judiciary. It is urged, therefore, that the action of the courts, in the exercise of this specially delegated power, cannot be regarded as of a judicial nature, and hence that no appeal will lie.

even after the statutes, must be made by the client in court in proper person. Thus in 7 Edw. IV. (9, A), one came to LITTLETON, J., in a case of writ of right, and prayed that he would receive him as an attorney. Said Littleton, "Where is he who would make you an attorney?" The attorney replied that he could not come, &c. Said Littleton, "If he does not come in proper person, we cannot receive you."

That attorneys were simply agents, is shown by the fact that two or more were often appointed jointly and severally, *conjunctim et divisim.* (12 Hen. VII., 9.) In this case a very learned and lengthened discussion arose as to the effect of the act of one without the knowledge or consent of the other.

After attorneys were allowed, as a matter of right, and without limit, a vast number of worthless and ignorant men naturally came before the courts. Lord Coke tells us that the introduction of attorneys was a great and lamentable innovation upon the common law. (2 *Inst.*, 250.)

The king, for a time, by his own royal will, attempted to regulate the matter. In 20 Edw. I., he directed the justices to provide and appoint, according to their discretion, attorneys in every county. Seven score he thought enough for all England, but the justices, in their discretion, might increase the number. Reeves regards this ordinance as having first conferred upon them the right to practise. (Vol. 2, 285.) In the reign of Edward II., the power was taken away from every one but the chancellor and chief-justices, thus showing that the matter was regarded simply as an appointment to office. The idea that attorneys held office, undoubtedly grew out of the limitation of their number in the ordinance of King Edward I.

These measures, however, did not reach the evil. The Legislature passed, in the reign of Henry IV., the model act upon this subject, from which all subsequent legislation has derived an impress. (2 *Inst.*, 215.) This act, after reciting, in the preamble, the mischiefs growing out of the former system, proceeds as follows:—That all attorneys shall be examined by the justices, and that by their discretion, their names shall be put upon the roll, and that they be good, virtuous, and of good fame, and be received and sworn well to serve in their offices. And the other attorneys shall be put out by the discretion of the justices, and if any of the attorneys do die, the justices shall make another in his place. (4 Hen. IV., ch. 18.) Even after an attorney was stricken off the roll, the king could send him back again by letters-patent. (20 Hen. VI., f. 37 ; 2 *Coke's Inst.*, 215.) By the terms of the act, the attorney, in such a case, was made to take an oath that he would not practise any longer. (4 *Coke's Inst.*, 101.) Before this statute no regulations had been made, either to define the qualifications for an attorney, or to point out who should be at liberty to undertake the office. (*Maugham's Law of Attorneys*, 9 ; *Dawson's Law of Attorneys, Introduction*, 7.) This statute is very important, both for what it enacts and what it discloses. It shows that an attorney at that time held an office ; that no system of testing attainments or character existed ; that there were attorneys who were not examined, and who were not good, virtuous, or of good fame. Attorneys now, for the first

It must be conceded that this objection, if well founded, in respect to the nature of the order appealed from, would be fatal to the appeal. It is indispensable to the validity of an appeal to this court, that it be from some judicial determination of the

---

time, go on the roll; they become attorneys of record, and cease to be mere attorneys in fact. (See 1 *Roll*, 3.) Crabb (*Hist. English Law*, 351) says, that the placing attorneys upon the roll was a new measure, now found necessary. This statute does not appear to have been at first strictly followed by the justices. Coke (4 *Inst.*, 76) laments the increase of attorneys beyond the number allowed by law. He says, "Concerning attorneys, the number is set down, and that they ought to be learned and virtuous; and, as I understand, the judges, at this time, have this matter in consideration." The act must evidently be regarded as restrictive, and as interfering with common-law rights. It can only be defended upon grounds of public policy.*

It is, therefore, evident that the qualifications are simply statutory, and their ascertainment might have been lodged with any other body of men. It was given to the courts as a matter of convenience. It was an appointment to office given in the same way as that of sheriff, coroner, and justice of the peace. Sheriffs began to be appointed by the justices in the reign of Edw. II. (2 *Reeves' Hist.*, 297.)

That the Legislature viewed the matter in this way, and regarded it as under their control, is evinced by a great variety of statutes. These may be classified as statutes: *a*, restricting the right to practise; *b*, restricting, arbitrarily, the number of attorneys; *c*, enlarging the right to admission; *d*, statutes for the government of attorneys.

*a.* By 3 James I. (ch. 7), it was enacted that no attorney shall be admitted in the king's courts but such as are brought up in the same courts. This was adopted, as was said, to avoid the infinite number of solicitors and attorneys.

*b.* Several Parliaments passed statutes decreasing the number of attorneys. (2 *Coke's Inst.*, 250.) By 33 Hen. VI., the number of attorneys in several counties was limited. There were to be six in Norfolk, two in Norwich, to be admitted by the chief-justices, and any who practised without admission were to be subject to penalties. (3 *Reeves*, 284; *Barrington on Statutes*, 20, note *d*.)

*c.* Enlarging the right to admission. By 6 & 7 Victoria (ch. 73, § 27), attorneys admitted in any one of the Superior Courts may practise in any other Superior Court. Examiners may be appointed by either of the common-law or equity courts, upon whose certificates attorneys may be admitted in all the courts. It may be said, in passing, that the fact that a statute authorizing the appointment of examiners was deemed necessary, would seem to throw a doubt upon the practice that sometimes exists, of appointing examiners by the court without any

---

* The details of this statute appear to have been copied from French and Roman legislation. By a royal ordinance in France, sixty years before (March 3, 1344), those who were admitted as advocates were obliged to take an oath, their names were in cribed upon a roll; while those who were not fit for the profession, were stricken off the roll, or "excommunicated," by the other members of the order. The Roman emperors required an admission or formal examination of the candidate by the governor of the province, on the certificate of law professors with whom the candidate had studied. When an advocate died, another was appointed in his place. (*Dupin's Profession d'Avocat*, 26, 50–53.) It was very common in early times when a regulation was made in England, that the same was adopted in France, and *vice versa*. (*Barr. on Stat.*, 130, 199; 1 *Reeves' Hist.*, 54.)

court below. But is not the proceeding here judicial? Although, in the general distribution of powers and duties among the great departments of the government, many are found the characteristics of which are so marked, that they can with cer-

statutory provision to that effect. The passage of the act shows how sensitive the English courts are in regard to any assumption of original power in the case. The control of Parliament over this subject is strikingly shown by the recent legislation in regard to the Court of Probate and the Court of Divorce. 20 & 21 Vict. (ch. 85, § 15), enacts that all attorneys and solicitors entitled to practise in common law or equity, shall be entitled to practise in the Court of Divorce. Section 63 requires the payment of a stamp-duty on admission.

20 & 21 Vict. (ch. 77), establishes the Court of Probate. Sections 40–45 enact that all attorneys and solicitors are entitled to practise in the Court of Probate, and the laws governing them are extended to them in their character of proctors.

Great light is also thrown upon this subject by the amendment act of 21 & 22 Vict., ch. 108. By the original act, no power had been given to the Court of Divorce to punish attorneys for misconduct. An express section (15) is provided for that purpose in the amendment act. This could have only been inserted on the view that otherwise the court would have no power to discipline attorneys.[*]

d. Rules for the government of attorneys will be found in 12 Geo. I., ch. 29, § 4. It appears that it had been common, previously, for attorneys to continue to practise, notwithstanding a conviction for perjury and forgery. Reference is also made to 21 & 22 Vict., ch. 108, § 15, before alluded to.

In our own State, before the Revolution, the power of appointing attorneys was exercised by the governor of the colony. These appointments are recorded in the Books of Commissions, and may be found in the office of the secretary of state. The first license recorded bears date, Nov. 15, 1709, and was granted by Gov. Ingoldsby. Appointments were undoubtedly made at an earlier period. The last appointment was made by Gov. Tryon, March 11, 1776, who issued, on that day, the last commission of any kind signed by a colonial governor. On the very next page, and without even the shelter of a blank-leaf, behind which to conceal our surprise, "the people of the State of New York, by the grace of God, free and independent," make their first appointment of a secretary of state.

The form of the license granted to an attorney was like the one subjoined, except that usually there was no restriction as to the counties in which the appointee should practise. The original commission may be found in the Law Institute in New York. The following is a certified copy, furnished by the kindness of the assistant-librarian, Mr. Tillinghast:

L. S.   }    John Montgomerie, Esq., Captain General and Governor-in-
GARDE BIEN. } chief of the Provinces of New York, New Jersey, and Territories thereon depending in America, and Vice Admiral of the same—

To all whom these presents shall come, or may concern:

* Since this argument was made, a statute has been passed in England (2 and 3 Vict., ch. 127), enacting that all previous attorneys of the court of the county of Lancaster should be admitted to all the courts of Westminster Hall. It allows the judges to institute a preliminary as well as an intermediate examination, in order to test the qualifications and ascertain the progress of candidates for admission. It also contains a provision, making it a contempt of court for any person to practise as an attorney without being admitted.

Matter of the Graduates.

tainty be referred to the appropriate department, yet this is by no means the case with all. The lines between the various departments are not and cannot well be very precisely defined, and there are many duties which may be, with equal propriety,

Know ye, that being well assured of the ability and learning of Edward Collins, Gentleman, have thought fit to constitute and appoint him an attorney at law, hereby authorizing him to appear in all his Majesty's Courts of Record, in the city and county of Albany, in the county of Ulster and Dutchess, within the province of New York, and there to practise as an attorney at law, according to the customs and laws of Great Britain, and customs and laws of said province, and all Judges and Justices, and others concerned, are hereby required to admit him accordingly. Given under my hand and seal at arms, at Fort George, in New York, this 18th day of July, in the second year of his Majesty's reign, Anno Domini 1728. By his Excellency's command. J. MONTGOMERIE.
J. S. Bobin, D. Sec'y.

In some cases the licenses were granted to practise in a single court, as in the inferior courts of Common Pleas of Cumberland county. In other cases, in two or more counties.*

It would appear, from a passage in Smith's History of New York, that the governors usually took advice from the chief-justice of the Supreme Court, as to whom they should appoint. But he laments that at times they licensed all applicants, how indifferently soever recommended. (*Hist. of New York*, 382.) The whole passage shows that the appointment of an attorney was wholly discretionary with the governor. He doubtless derived his power from that clause in his own commission from the king, which ran as follows :—" We do hereby authorize and empower you to constitute and appoint judges, and in cases requisite,

---

\* The following statement indicates the general results of the Books of Commissions:

There were licensed by the colonial governor, during sixty-eight years preceding the Revolution, one hundred and thirty-six attorneys. During the first eight years, three, to practise in all courts of record.

From 1717 to 1726, both inclusive, eight, to practise in all courts of record.

From 1727 to 1736, both inclusive, six, to practise in all courts of record, excepting in three instances the Mayor's Court of New York.

From 1737 to 1746, both inclusive, three, to practise in all courts of record.

From 1747 to 1756, both inclusive, twenty-three—fifteen in all courts of record and eight in inferior courts of Common Pleas.

From 1757 to 1766, both inclusive, thirty-three—twenty-five of record and eight in inferior courts.

From 1767 to 1776, both inclusive, sixty—thirty-seven of record and twenty-three in inferior courts.

If we examine the number of attorneys admitted to all courts of record, we have—

In the first eight years, three;

| In the decade succeeding, eight; | In the decade succeeding, fifteen; |
| " " " six; | " " " twenty-five; |
| " " " three; | " " " thirty-seven; |

making, in all, the number of ninety-seven attorneys admitted to full practice in sixty-eight years.

We can but wonder, in view of the smallness of their number, at the complaints made by Gov. Colden to the Earl of Halifax, in his letter of Feb. 22, 1765, where he speaks of the dangerous influence which the profession of the law had obtained in this province more than in any other, and wishes that the "people were freed from the domination of the lawyers." It would seem that the Books of Commissions cannot contain the names of all the practitioners.

referred to either.    Duties of this class, and they are very numerous, necessarily take their character from the departments to which they are respectively assigned.    The same power which, when exercised by one class of officers not connected

commissioners of oyer and terminer, justices of the peace, and other necessary officers and ministers in our said province, for the better administration of justice, &c."

Such a license being produced in court, the oaths and subscription were taken, and the attorney was qualified to practise in every court of the province.    (*Smith's Hist. of New York*, 382; *Street's Council of Revision*, 34.)

There is a provision in the city charter of New York, granted during the time of Gov. Montgomerie, Jan. 15, 1730 (see *Kent's City Charter*, 74, § 30), which furnishes valuable information upon this subject.    A court of record having been established by the charter, in the city of New York, of which the mayor, recorder, and aldermen were to be judges, the thirtieth section proceeds :—" We do hereby constitute, name, and appoint James Alexander, Joseph Murray, John Chambers, William Smith, George Lurting, William Jamison, Richard Nichols, and Abraham Lodge, gentlemen, to be the present attorneys, and each of them to be an attorney of and in the said court of record, for and during the good behavior of each of them respectively ; and we do hereby, for us, and our heirs and successors, grant and ordain that no other attorney or attorneys whatsoever, besides the aforenamed attorneys, during the time that they shall all remain attorneys of said court, shall be permitted or suffered to practise as an attorney of or in the said court."    In the latter part of the section, rules are provided for the government and discipline of these attorneys by the court.    The action of the court is, in every case, subject to the approval of thé governor.    Of the gentlemen above named, some had been previously admitted attorneys.    Abraham Lodge was not admitted to other courts of record until July 30th, afterwards.    (See *Book of Commissions*, July 30, 1730.)    He is, therefore, constituted an attorney in this court, by mere force of the charter, and without any admission.    Chancellor Kent justly says, in note 43 to this section, that this is a remarkable instance of professional monopoly.

That this section of the charter was observed in practice, is shown by the fact that almost all licenses to practise in the inferior courts throughout the residue of the colonial period, expressly except the Mayor's Court of New York.    Thus John Colden was appointed July 20, 1750, an attorney in all the inferior courts in the State, &c., except the Mayor's Court of New York, and a similar license was given to Bryan Lefferty, February 4, 1773.    On the other hand, Richard Varick was commissioned April 6, 1774, as an attorney in the Mayor's Court of New York, and in October of the same year, in all the courts of record in the State.

The general correctness of this historical outline is shown by the statement of the Supreme Court, in the case of The People *a.* The Justices of Delaware.    (1 *Johns. Cas.*, 182.)    The court says : "In our own State, before the Revolution, the power of appointing attorneys was exercised by the governor of the colony.    His power was recognized by the courts, and the attorneys were admitted to practise."

When the State organization was effected by the Constitution of 1777, the power to appoint attorneys was vested in the courts.    (§ 27.)    The provision was very special, and provided that all attorneys, solicitors, and counsellors at law shall be appointed by the court, and be licensed by the first judge of the court in which

with the judiciary, would be regarded and treated as purely administrative, becomes at once judicial when exercised by a court of justice. This is shown by the definitions uniformly given of the word judicial. Webster defines it thus: "Per-

they shall respectively plead and practise. (*Const.*, § 27, last clause.) By a further provision they are to be regulated by the rules and orders of the said court. The word appointment is noticeable as indicating the fact that an attorney was considered as holding an office. Statutes followed, indicating what steps should be taken in regard to the qualifications, oaths, and removal of attorneys. (20th February, 1787 ; 20th March, 1801 ; *Rev. Laws of* 1813, 1, 416.) In the case of Thomas Addis Emmett, the court held, in the presence of this constitutional provision, that they had no power to exact any oaths of counsellors which were not prescribed by statute. (2 *Cai.*, 386.) The court remarked that the act of this State upon this subject in existence at the time, was borrowed from 4 Henry IV., c. 18. Alienism was, therefore, held to be no bar to admission.

The Constitution of the State in 1822 is silent upon the subject of attorneys. The *consequence is*, that, after its adoption, the right of the court to admit attorneys rests wholly upon statute.

This subject was thereupon provided for in the Session Laws of 1823 (c. 182, § 19), requiring attorneys to be licensed by the courts in which they practise. The general provisions of this law were incorporated into 1 Revised Statutes, 108, 109 ; and 2 Ib., 187.

It will thus be seen, if this view is right, that at the time of the adoption of the Constitution of 1846, the subject of licensing and admitting attorneys was wholly in the discretion of the Legislature. The matter had been disposed of in England in various ways. First, there had been no attorneys of court, then an admission *pro hac vice*, or generally was obtained by the king's license ; then the Legislature had allowed attorneys in a few cases, and steadily increasing the number, had included nearly all ; at first any one could appear as attorney, no matter what his character ; in the beginning the king, and then the Legislature, had established rules for admission, now severe and restrictive, at other times easy and liberal ; and again, Parliament had enacted that persons should be attorneys without examination.

In our own country there was first the governor's license ; then constitutional restrictions ; next the constitutional restrictions were removed, and the whole subject was left open to legislative discretion. If any matter was ever one of pure legislative action it must surely be this. Decisions in this country rest the power to govern and discipline attorneys solely upon statute. (Missouri *a.* Foreman, 3 *Mo.*, 602 ; Smith *a.* State of Tennessee, 1 *Yerger*, 228.)

2. What appears so plain historically, is also evident upon grounds of public policy. The regulation of the legal profession stands precisely upon the same principle as that of medicine. It is solely a question of public policy whether these professions shall be open or closed.

The same principles should govern a Legislature, as control them in prohibiting the sale of lottery tickets and in licensing taverns. This point is fully examined in Jordan *a.* Overseers of Dayton (4 *Ohio*, 308), where these principles are applied to the right of the Legislature to control the practice of the profession of medicine, and the court liken it precisely to the case of attorneys at law.

taining to courts of justice, as judicial power;" and again, "proceeding from a court of justice, as a judicial determination." In Bouvier's Law Dictionary, it is defined as follows: "Belonging to, or emanating from a judge as such, the authority

---

3. Again, an attorney is clearly a public officer ever since the statute of Henry IV., and as such, in the absence of any constitutional restriction, the mode of his appointment may be regulated by the Legislature. The authorities sustaining this point will be noticed hereafter.

III. The act of April 7th does not conflict with the Constitution of 1846. This appears from the following reasons :

1. The act is within the proper scope of legislation, as has been already shown. The Legislature has, as has been seen, the right to control the subject, unless restricted in the Constitution itself.

2. This matter does not come within the general clause of the Constitution conferring jurisdiction upon the courts. "There shall be a Supreme Court, having general jurisdiction in law and equity." (*Const.*, art. 6, § 3.)

*a.* It was not originally a judicial subject, but legislative.

*b.* It does not follow because power has been delegated by the Legislature to courts of law, that it is judicial in its character. This is not a case between party and party, nor is it a decree affecting the title to property, which seem to be properly judicial. (Rice *a.* Parkman, 16 *Mass.*, 326.)

*c.* Nor does it follow because judgment is exercised in regard to a subject-matter, that it is in its own nature judicial. Judgment may be exercised, and yet the act may not be strictly judicial. Thus the Constitution provides that the Legislature may pass special acts of incorporation, when in their judgment the object of the corporation cannot be accomplished under general laws. No one imagines that this is an instance of judicial power. So when an inferior officer is removed by a superior for cause. Errors when committed in such cases cannot be usually reviewed, see Mosier *a.* Hilton (15 *Barb.*, 657) ; United States Trust Co. *a.* Brady (20 *Ib.*, 119, said to be affirmed by Court of Appeals, 30 *Ib.*, 39), except where authority is conferred upon a court as such, and its due exercise can be claimed by some person as a matter of right, and the ordinary practice of the courts furnishes means for the correction of the mistake. This power may be exercised by the court in its judicial capacity, though in its own nature it may not be strictly judicial. This principle is recognized in the Matter of extending Canal and widening Walker streets. (2 *Kern.*, 406.) The court deals with jurisdiction conferred by legislation in the same manner as though it were granted by the Constitution, whenever such jurisdiction is conferred upon it as a court. (*Ib.*, 411.) This matter evidently comes within that branch of the jurisdiction of the courts which was conferred by statute.

3. By the express language of the Constitution, the Legislature shall have the same power to alter and regulate the jurisdiction and proceedings in law and equity as they previously possessed. (*Const.*, art. 6, § 5.) Having previously possessed the power to control the admission of attorneys entirely, that power must still be presumed to exist, unless withdrawn by express words or by necessary implication. In the absence of such words, the power of the Legislature is as unrestricted as that of the English Parliament. (Phœnix *a.* The Emigrant Commissioners, 12 *How. Pr.*, 14 ; Cowen, J., 21 *Wend.*, 563.)

vested in the judges." Whatever emanates from a judge as such, or proceeds from a court of justice, is, according to these authorities, judicial. This precise principle was involved in some of the cases which have been from time to time presented to

---

4. This power has not been withdrawn from the Legislature by express words. If removed at all it must be by implication.

The language of the Constitution affecting this point is: " Any male citizen of the age of twenty-one years, of good moral character, and who possesses the requisite qualifications of learning and ability, shall be entitled to admission to practise in all the courts of this State."

This section cannot be regarded as an implied restriction upon the legislative branch of the government, for the following reasons :

*a.* The provision was inserted in the Constitution *diverso intuitu.* At the time of the adoption of the Constitution of 1846, there was a strong feeling adverse to any restrictions upon admission to the bar. This feeling existed in the convention which formed the Constitution. A resolution was adopted at an early period of the session, instructing one of the committees to inquire into the expediency of abolishing all restrictions upon the practise of the legal profession. (*Argus Debates,* 73.)' At a later period it was proposed to restrict the courts so that they could not prohibit any person from practising except for want of good moral character. This not appearing likely to be adopted, the clause already alluded to was accepted by way of compromise. The plain object was not to confer power upon the courts, but privileges upon the citizen. The use of the word "; entitled" shows the purpose with which the section was adopted. (*Ib.,* 575–577.) It will be remembered that the number of the profession had been limited in England by statute. By our own statutes (1 *Rev. Stat.,* 98, 1 ed.), as many attorneys, solicitors, and counsellors might be admitted as the courts licensed to practise. But the Legislature might reverse their own policy, and the courts be allowed to limit the number. The Constitution fixed a rule that every male citizen, &c., should be entitled to practise. This is a proper case for the application of the well-known principle concerning the construction of statutes, recognized by Blackstone in his Commentaries, to regard the old law, the mischief, and the remedy. Another reason for the provision was that as the courts are prohibited from making appointments to office, as will appear hereafter, some such clause was necessary, if admissions were thereafter to take place.

*b.* The clear object of the constitutional convention was to take away from the judiciary the power of appointment to office, as shown by the prohibition of the Constitution, that the judiciary shall appoint to any public office. Section 8, of article 6, is as follows: "They (*i. e.,* the judges of the Court of Appeals and of the Supreme Court) shall not hold any other office or public trust. All votes for either of them, for any elective office, except that of justice of the Supreme Court, or judge of the Court of Appeals, given by the Legislature or the people, shall be void. They shall not exercise any power of appointment to public office. Any male citizen of the age of twenty-one years, of good moral character, and who possesses the requisite qualifications of learning and ability, shall be entitled to admission to practise in all the courts of this State." Now it will be shown that an attorney is a public officer, and that therefore the court can no longer appoint him.

That an attorney is a public officer, is shown by the language of 4 Henry IV. '

our courts under the acts for opening streets in the cities of
New York and Brooklyn. The judges at first considered them-
selves, in the exercise of their powers under those laws, as acting
not strictly as judges, but in a sort of administrative capacity as

(c. 18), as well as by the language of the Constitution of 1777, and by judicial
decisions. Says Lord Hardwicke, in Walmesley *a.* Booth (*Barnardiston's Ch. R.*,
478, 479), " attorneys and solicitors are to be considered as public officers and
ministers of justice. For this reason they have fees allowed them, and are under
the government of rules in regard to the method of their proceedings." This case
is recognized in the Matter of Daniel Wood. (*Hopkins' R.*, 6 ; and in Merritt *a.* Lam-
bert, 10 *Paige*, 356, unanimously affirmed by the Court of Errors, in 2 *Den.*, 607.)

By 1 Revised Statutes (95, 98), attorneys are treated as public officers.

It is a well-known rule of interpretation, that a Constitution is to be construed
in reference to the use of language by laws existing at the time of its adoption,
and by the practice under them. (Maryland *a.* Wayman, 2 *Gill & Johns.*, 254 ;
Attorney-General *a.* Brunst, 3 *Wis.*, 787 ; People *a.* Coleman, 4 *California*, 46.) The
same rule is applied to statutes. Thus the words " beyond seas," had a meaning
at common law before the statute of limitations, and such a meaning was given
to the statute regarding the East India Company, passed in 1811. (Ruckmaboye
*a.* Mottichund, 32 *English Law & Equity*, 84.) This case, which was decided by the
judicial committee of the privy council, contains a full discussion of the point.
Dwarris on Statutes (565), says that the word " Cottages" has the same sense in
the statute 31 Eliz., as in Domesday Book. The result is, that the court cannot
appoint attorneys. They are either under the constitutional provision appointed
by its own energy, or if appointed at all, they come within the general clause in
article 10, section 2, of the Constitution. " All officers whose election or appoint-
ment is not provided for by the Constitution, and all offices which may hereafter
be created by law, shall be elected by the people or appointed as the Legislature
may direct." The selection of the mode in which an appointment shall be
made, is a proper exercise of legislative power. (State *a.* Kennon, 7 *Ohio, N. S.*,
546.)

At all events, the only function which the courts can be supposed to exercise
upon this subject since the Constitution, is simply to ascertain the qualifications
of applicants to be admitted to practise, and to enter an order not appointing at-
torneys, but simply stating that they are found to possess the requisite qualifica-
tions. This appears also from section 75, of the judiciary act.

*c.* It may, however, be said, as there is a form of admission to the bar clearly
implied by the Constitution, and as some one is to judge of the age, character,
and requisite qualifications of learning and ability, that the Supreme Court is the
necessary body to ascertain these qualifications by an actual examination of the
candidates. This argument, if valid at all, must go to the length of saying, that
each court is necessarily the only tribunal which can personally judge of the quali-
fications of attorneys. But it is clear that admission is an act of the court, more
or less formal, and depending upon such proof as the Legislature may provide.
Were it otherwise, the argument would prove too much, for it overthrows entirely
the present practice by which the Supreme Court admits to all the courts. How
does the Supreme Court exercise this power? Certainly not by the Constitution,
but by the judiciary act of 1847. Could not the power have been conferred upon

commissioners; but subsequently changed their views in this respect, and took the ground, which has since been repeatedly confirmed, that the power was conferred not upon the judges as individuals, but upon the court; that their action in the matter

the Court of Appeals to have admitted to the Supreme Court? There cannot be a doubt of it. The Supreme Court of the first district, in holding the law of April 7, 1860, to be unconstitutional, do necessarily pronounce against the validity of all the admissions which they have themselves made, from the year 1847 down to the present time, allowing by their own fiat attorneys to practise in all the courts of this State.

*d.* Again, to say that the courts shall necessarily test the qualifications by their own examination, is simply begging the question. How does it appear to be so? The Constitution does not say so: admit that these qualifications are to be proved to the court—to each court. The question still recurs, how are they to be shown? To the Court of Appeals they are proved by the order of the Supreme Court, admitting to practise. To the Supreme Court they are facts to be proved by evidence. But it is altogether competent to the Legislature to determine what effect a certain instrument shall have as evidence. This point, which does not seem in need of argument, is adjudicated by the Court of Appeals in Hand *a.* Ballou (2 *Kern.*, 541). As it is expressed by the court, the Legislature have the power to determine by law what in civil cases shall be received by the court as presumptive evidence. The principle is the same whether the evidence be presumptive or conclusive. Thus the Revised Statutes have enacted, in a number of cases, what shall be regarded as presumptive, and what as conclusive evidence of a fact. Thus certified copies of decisions of the county superintendents of the poor are conclusive evidence of the facts therein contained. (1 *Rev. Stat.*, 624, 1 ed., §§ 61, 88.) In fact, the power of the Legislature to prescribe evidence for the courts has never been questioned. (DeCamp *a.* Eveland, 19 *Barb.*, 89.) So also where authority is conferred upon a body of men to decide a fact, and the decision is made accordingly, and the fact ascertained, no court has power to review the decision. (See Lyon *a.* Jerome, 26 *Wend.*, 485, 491, 495, 498.) See also the case of Phœnix *a.* The Emigrant Commissioners (12 *How. Pr.*, 3–15), for the same point. The consequence is that the Legislature had the constitutional right to enact, that the diploma granted under the provisions of the act in question should be evidence that the graduate possessed the qualifications requisite to an admission.

*e.* No such force can be given to the word "requisite" in the Constitution as to withdraw the subject from the sphere of legislation. The proper meaning of the word requisite is, that which is required. The question then recurs, required by what? The answer is, required by statute,—as all the requisites existing at the time of the adoption of the Constitution were statutory. If the word "requisite" be supposed to have had a fixed meaning given to it by the Constitution, and that sense to be the precise requirements of the year 1846, the consequence would follow that those qualifications could not be increased by the Legislature or by the court. The perpetual test of fitness to practise the profession would be the learning and ability required when the Constitution was adopted. It is evident, however, that the qualifications must be variable, and that a flexible and not an unyielding rule must exist. If then, the requisitions change, the only body who

was to be regarded as judicial, and that all the ordinary incidents of judicial proceedings were applicable to such cases.

In the case of Patchin *a.* The Trustees of Brooklyn (2 *Wend.*, 377), which was carried from the Court of Common Pleas to

---

can change them is that one which had the power to establish them when the Constitution was framed—that is, the Legislature.

*f.* The word "admission" in the Constitution has no such force as to confer exclusive power upon the Supreme Court. This word has different meanings, but does not necessarily, *ex vi termini*, imply any such sense as is given to it in the opinion of the Supreme Court, that is, to ask leave to enter, nor does it imply any right on the part of the admitter to refuse entrance. Its proper etymological meaning is motion into a place. Roget, in his Thesaurus, couples it with entrance, ingress, entry, introgression, &c., 290,295. It often means simply entrance ; for example, we speak of the admission of heat through strata. Webster gives as one of its meanings the "power or right of entrance," hence actual entrance. Shakspeare often uses the word in that sense. Thus in Cymbeline, act 2, scene 3, Cloten says: " 'Tis gold which buys admittance ; oft it doth."

The ancient writs before alluded to show in what sense the word is used in connection with attorneys. The king commanded the justices to admit, and Governor Montgomerie required the justices to admit such and such a person as an attorney. Maugham, in his Law of Attorneys (6), says that the king might order the court to admit an attorney, which it was bound to do. To the lower courts, if commanded to admit, and they did not, an attachment would issue. (*Fitzherbert, N. B.*, 369, C. D.)

The meaning of the word may be tested by an example. The owner of a picture-gallery gives to a friend a ticket, upon which are printed the words, "Admit the bearer." He presents this to the official in charge of the gallery, and demands admission. Can we judge of his surprise when the attendant replies, "Do you not observe upon the ticket the word 'admit?' I am in the habit of obeying the commands of my master, but in this case I am evidently released. This word 'admit' clothes me with a discretion. I have a right to refuse you entrance, which I now do. If you ask me why, I can only say, ' *Sic volo, sic jubeo, stat pro ratione voluntas.*' "

The best test of the meaning of the word in the Constitution is to search the clause itself. The word "entitled" immediately precedes it. This means either a right to demand a thing, or that one is qualified to make a demand. ( *Webster.* ) It cannot have the latter sense in this section, because the Constitution supposes that the citizen has the qualifications before he is entitled. It evidently means a "right to demand." We may then insert in the clause the definition of the word "admit" given by the Supreme Court. The clause would then read : Any male citizen, &c., shall have a right to demand that he may have leave granted to him to practise, and he shall also have a right to demand that such permission be refused.

Such a construction gives no force to the words "having the requisite qualifications." The whole sentence would read : Any male citizen of the age of twenty-one years, of good moral character, and possessing the requisite qualifications of learning and ability, shall be entitled to ask leave to practise in all the courts of this State, and shall also be entitled to have that leave refused. This

the Supreme Court by certiorari, Chief-justice Savage said: "This is a specially delegated power to the Court of Common Pleas as a court, and not to the judges as an *ex-officio* duty; and when such a power is committed to a court, all the ordinary

shows that the qualifications precede the admission, and that the word has no such sense as it is assumed to have. The words "entitled to an admission" confer a legal right which the court has no power to refuse. The most that can be claimed is that evidence ought to be submitted to the court to show how the person is entitled, which has been already noticed. If the word "admit" means "to ask leave," then it implies that leave must be asked of each and all the courts. This construction would overthrow the present practice of the Supreme Court.

*g.* The Legislature enacted in one case, that parties had sufficient qualifications under the Constitution. In the judiciary act, it was declared that every previously admitted attorney should become, and be thenceforth a counsellor. The qualifications of an attorney were determined by the Legislature itself, to be sufficient to admit him as counsellor without examination. This contemporaneous construction of the Constitution is entitled to great weight. (Stuart and Laird, 1 *Cran.*, 299; Moers *a.* The City of Reading, 21 *Penn.*, 188; People *a.* Green, 2 *Wend.*, 266, per MAROY, J.; *Sedgwick on Constitutional Law*, 487–8.) The Legislature distinguish in section 75, chapter 280, of 1847, between being entitled to practise and an admission to practise. So the act of 21 and 22 Victoria (ch. 85 in § 15), enacts that an attorney shall be entitled to be a proctor in the Court of Probate, and in section 63 provides a fee for an admission. The similarity between the provisions of this act taken together, and the language of our own law, and of our Constitution, is noticeable. The Legislature have passed various enactments requiring the courts to admit on the examination of counsellors. (*Laws of* 1851, ch. 43; 1853, ch. 91; 1855, ch. 310.) An act somewhat like the one in question will be found in Session Laws of 1859, ch. 267; also 1860, ch. 187, regarding the University of New York.

*h.* If it be said, why admit to practise? the answer is, such is the language of the Constitution and the law. In both cases the party is declared to have a title to be admitted. It may not be absolutely necessary, but still it is valuable to the practitioner. It furnishes him with a convenient means of proving his title to practise. His name is upon the roll, which was one of the great objects of the statute of Henry IV. It is more convenient to the court in administering discipline. It is not, however, for the court to object that such a proceeding is unnecessary. It is sufficient that the Constitution declares his right to it, and distinguishes between the title to an admission and the act of admission itself.

*i.* It may be urged that this section was not at all directed to the legislative power, but simply to the judiciary. It is found in the chapter on the judiciary, and in immediate juxtaposition to the subject of appointment by the judges. Its object seems to have been to prevent the judiciary from unreasonably restricting the right to practise. Therefore the Legislature not being intended, their power over the whole subject remains as plenary as it did before the Constitution, except that they cannot restrict the right more narrowly than the Constitution has done.

If it should be thought to have been intended to act upon the Legislature, it can only be restrictive under the maxim "That the enumeration of certain per-

powers of such court, so far as they are applicable to the discharge of the particular duty, may be exercised as in ordinary cases." The same judge, in a subsequent case, viz., in the Matter of Canal-street (11 *Wend.*, 154), said: "If they misbe-

---

sons, is the exclusion of all others;" "*Expressio unius exclusio alterius.*" Great caution is necessary, however, in the application of this maxim. (*Broom's Legal Maxims*, 415.) Lord Coke furnishes to us an illustration of this principle. He says: "Although by Magna Charta, common pleas are no longer to follow the king, it does not result that other pleas must follow the king." (2 *Coke Inst.*, 25.)

The correct rule seems to be, that whenever the object of the provision is to confer privileges upon the citizen, the maxim is not to be applied. It has never been supposed that the ninth amendment to the United States Constitution, which provides that the enumeration of certain rights shall not be construed to deny or disparage others retained by the people, was actually necessary, but only inserted for greater caution. The maxim cannot be so perverted.

5. This law is not unconstitutional, because it omits to mention that the applicant must be a male citizen of the age of twenty-one years, and of good moral character.

*a.* The Constitution is to be interpreted in connection with the law. It is tacitly assumed that the Legislature intended not to infringe upon the Constitution, unless the act directly necessitates an opposite construction, It surely cannot be necessary to repeat the Constitution in every law. Legislation would greatly increase in verbosity by the enforcement of any such rule. Such has always been the benign interpretation of statutes by the courts of common law. Where statutes are made, there are some things which are exempted and foreprized out of the provisions thereof by the law of reason, though not expressly mentioned. (*Plow.*, 13 B; 2 *Inst.*, 118; *Dwarris on Statutes*, 623.)

Where an act gives a thing generally, it is subject to the general control and order of the common law. Words are to be taken in a lawful and rightful sense, if possible. (*Dwarris*, 594; *Co. Litt.*, 381; *B. Smith's Commentaries*, 697.)

In order that a law be unconstitutional, it must be plainly and manifestly in collision with some constitutional provision. (Scott *a.* Smart, 1 *Manning, Mich.*, 295.) Every reasonable intendment is to be made in favor of the proceedings of the Legislature. It is not to be presumed that the Legislature has violated the Constitution. (Miller and Gibson *a.* The State, 3 *Ohio, N. S.*, 482.)

*b.* By section 2 of the law of April 7, 1860, all acts and parts of acts then in existence, not inconsistent with this act, still remain in force. Statutes in *pari materia* are to be construed together. (*Smith on Constitutional Law*, 750–770.) Consequently it may be properly held that the judiciary act of May 12, 1847, chapter 280, is still in force, so far as it is not inconsistent with this law in reference to admissions under it. According to Dwarris on Statutes (569), acts in *pari materia* are to be regarded as one scheme. That class of provisions which provides for proofs of moral character, age, and citizenship, may perhaps be enforced as to admissions under the law in question. This view would involve the idea that the object of the law of April 7, 1860, was simply to furnish the court with evidence of learning and ability.

*c.* But the law of April 7, requires not merely an examination of three counsellors, but also their recommendation. The word "recommendation" involves the

Matter of the Graduates.

have we punish them by attachment, as we might referees in a case committed to them. If, for any cause persons appointed, as commissioners are shown to be improper, we may, by virtue of the power of appointment, remove them and appoint others.

idea that the committee, who must consist of counsellors at law, are satisfied of their fitness in all respects, both under the Constitution and the laws. It will be remembered that these counsellors, like the judges and the Legislature, have sworn both to support the Constitution and the laws, and that it cannot be assumed that they will, in violation of their oaths, recommend any one for an office who is known to be disqualified by the express language of the Constitution. This plain principle is supported by numerous decisions. Thus in Miller and Gibson *a.* The State (3 *Ohio, N. S.*, 484), the court says : "The Legislature take an oath to support the Constitution, and we are not at liberty to presume that they have disregarded their oaths." So in Marion Railroad Co. *a.* Davis (13 *Georgia*, 68), it is said, all presumptions are in favor of a Legislature who have sworn to obey the Constitution. The same principle which is here invoked in favor of a legislative body, would apply to a body of commissioners who were intrusted with power of the kind in question. Will it be contended that it was necessary in the judiciary act to have enacted that the court shall admit none but such as have the requisite qualifications ? Could not the court act on the Constitution and the law combined ?

*d.* Even if this court should hold that the words of the law are too broad, it would not necessarily be void. It is a familiar principle of constitutional law to hold an act partly valid and partly void, provided that the valid and void parts can be separated. (See Commonwealth *a.* Clapp, 5 *Gray*, 97, 482, 486 ; Mobile and Ohio Railroad Co. *a.* State, 29 *Ala.*, 573 ; State *a.* Copeland, 3 *Rhode Island*, 33 ; State *a.* Com. Perry Co., 5 *Ohio, N. S.*, 497.) The case in 5 Gray (482–6), holds that a portion of a section of an act may be valid and the other part void, provided that the Legislature must not be supposed to have designed the whole as one scheme, and to have refused to pass the one portion without the other. Under these decisions, it may well be doubted whether, even if the Legislature had expressly enacted that minors, or females, or aliens might be admitted, as well as those having the constitutional qualifications, the law would be totally void. It would undoubtedly be void *pro tanto*. For the sake of illustration, it may be supposed that the law consisted of two entirely separate sections ; one of these admits those having the constitutional qualifications ; the second, those who do not. Could not one of these sections be declared void and the other valid ? Would it then make any difference if they were in the same section ? Certainly not. The Constitution separates the two classes by the hypothesis, and they are not confounded, because they stand in each other's vicinity. Even at common law, goods are not said to be confused, because they stand in juxtaposition. A part of a section of a law being regarded as valid, and another part void, the court will treat the unconstitutional part as if it were stricken out of the statute. (29 *Ala.*, 573 ; 3 *Rhode Island*, 33.)

*e.* The Legislature have provided that the candidates shall be admitted. If this means that the court shall make an order for admission, then it has a superintending power to see that these persons possess the requisite qualifications.

*f.* The argument proves too much. For if the committee of counsellors had

We are not the mere conduits of conveying authority to the commissioners. They become officers of our court, the proceeding is a proceeding in our court," &c.

It will be seen that the chief-justice in these extracts spoke

been expressly prohibited by statute from admitting unqualified persons, they might still, as a matter of fact, have recommended persons who did not possess the requisite statutory qualifications. If it be said that they break their oaths if they do so, that could also have been said in the former case. It is a very trite principle of constitutional law, that the possible abuse of a power or authority is no argument against its existence.

6. The law is not unconstitutional because it declares that no diploma of the college shall be sufficient evidence of the right of any graduate to be admitted to practise, which is given for any period of attendance upon the Law School for less than eighteen months.

*a.* The Constitution does not say so. At most this merely provides that the requisite qualifications of learning and ability shall be found to exist. What evidence shall be furnished of that fact does not anywhere appear. That the Legislature could not enact that this should be the only evidence of qualification, may be admitted. But that they could not enact that a term of clerkship should be a means of furnishing evidence of qualifications is not at all clear.

*b.* No student in the Law School is confined to an application under this law. He may, like his fellow-citizens, resort to the former practice. The Legislature provides two modes of admission to the bar; these are not exclusive, the one of the other, but collateral. They say to young men, if you take the one mode, you may be admitted in the one way; if you take the other mode, in the other. If you go to the Law School and ask for admission under the act of 1860, you must study so long; if not, you need not study at all, but may take the chances of an examination. You may leave the Law School at any hour and apply to the court for admission. Here are two parallel roads to the same point. The one is open to all. You have only to knock at the gate and be admitted. If you choose to take the other road, it will take you a much longer time to reach the entrance. If you do not like to pursue that course, leave it any moment. We will never make the other entrance more difficult of access for that reason. Who can say that, under such circumstances, there is any restriction upon the rights of the citizen?

*c.* Again. The clause in question simply declares what effect the contents of a certain piece of paper or parchment shall have as evidence. The act does not say that the student may not be admitted to the bar unless he has studied in the Law School eighteen months, but it simply declares that the diploma shall not otherwise be evidence of his right to practise. Can it be unconstitutional to declare what effect a document shall or shall not have as evidence? (See Hand *a.* Ballou, 2 *Kern.*, 541.)

*d.* No man can raise this objection but the student. If he chooses to waive his constitutional privilege, who can object? It is an ancient maxim that any one can renounce what was intended for his benefit.

7. The law should not be declared unconstitutional, unless the question is free from doubt. (Lunt's Case, 6 *Maine*, 412; Franklin Bridge *a.* Wood, 14 *Georgia*, 80; Scott *a.* Smart, 1 *Manning*, 295; Fletcher *a.* Peck, 6 *Cranch*, 87; Morris *a.*

not of the action of the court in reviewing and confirming the reports of the commissioners which might be considered as more especially of a judicial nature, but of the appointment of the commissioners themselves; and the substance of what is said is, that as the power was conferred upon and exercised by

---

People, 3 *Den.*, 381; Decamp *a.* Eveland, 19 *Barb.*, 81; Foster *a.* Essex Bank, 16 *Mass.*, 245; also Farmers' Bank *a.* Smith, 3 *Serg. & R.*, 63, 73; *Sedgwick's Constitutional Law*, 482–4.) There must be no rational doubt (*Exp.* McCollum, 1 *Cow.*, 550). This rule is especially applicable when there has been a contemporaneous and continuous construction of the provision by the Legislature for many years, which has been uniformly acquiesced in.

The case of McKeon *a.* Devries (3 *Barb.*, 196), is not opposed to this argument. There was no admission provided for in that case, nor did the Legislature provide any mode of ascertaining qualifications. It was an attempt to make an agent rather than an attorney.

8. The argument *ab inconvenienti* is of no force on this question, unless there is a doubtful construction. (People *a.* Green, 2 *Wend.*, 277.) The only point that can be discussed is whether the law be unconstitutional, which is a question of law. Still even that argument may be successfully met. It is well known that under the present system of admission to practise, no uniform rule is evolved. The examination is mainly conducted by a fluctuating board of examiners; anon, rigid and severe, at other times easy and placable, while eight such boards are in session twice every year. No other public officers are treated in such a manner as this. It may be assumed that law schools proceeding upon a scheme or plan, may be so conducted that an examination may be a test of qualifications at once comprehensive and minute.

The mode of acquiring the principles of the Roman law may be referred to. It is well known that even during the time of the republic, skilful lawyers were surrounded by students, who followed them to the forum, listened to their expositions of legal principles, and thus learned the principles of jurisprudence. After the foundation of the empire, law schools arose. Jurisprudence had assumed the form of a severe and systematic science. When the two great sects in jurisprudence arose, Labeo, the parent of the one, was a distinguished professor, who spent six months of the year with his scholars, and six months in preparing lectures. The great jurists begin to speak of their preceptors, and of the school to which they belonged. It may be said that the profound lawyers in the palmiest days of Roman jurisprudence were formed by the oral instruction which they received in law schools. (*Ortolan's History of Roman Jurisprudence*, ed. 1858, § 385.) Later, in the days of Justinian, attendance upon particular schools was made compulsory, as it is now upon the continent of Europe. (See *Savigny's Hist.*, ch. 6, 435, 440.)

It is safe to say that jurisprudence should be studied like other sciences—the principles should be known first, and the practice acquired afterwards. It would not be a great mistake if education in schools as under the Roman law was made compulsory. In such a case, public opinion and legislation might and would require the schools to maintain a high standard of excellence.

IV. The order entered in this matter, denying the application of the appellant to be admitted to practise, should be reversed.

the court as such, and especially as the officers when appointed, were in some sense officers of the court, the cases were to be regarded as subject to those incidents which ordinarily attend judicial proceedings. That the court in appointing these commissioners act judicially was also asserted by Gardiner, president of the Senate, in the case of Striker *a.* Kelly (2 *Den.*, 323). He says: "It might be objected with equal plausibility that the appointment of referees was an executive and not a judicial act. The referees, it is true, are officers of the court; but these commissioners are *quasi* officers, and may be compelled to perform their duty by attachment."

The same judge in a subsequent case in this court, viz., in the Matter of Canal and Walker streets (2 *Kern.*, 406), used, in reference to the same class of proceedings, the following language: "If the law of 1813 enlarged the jurisdiction of the Supreme Court, which in effect was decided in Striker *a.* Kelly, no other change was produced. The powers incident to its general jurisdiction, so far as applicable, at once attached to the new subject. In administering this law, as every other, the court would require the services of its officers, punish for contempt, issue attachments, use the buildings appropriated to the ordinary business of the court, and set aside the proceedings on sufficient cause."

The principle to be deduced from these extracts obviously is, that where any power is conferred upon a court of justice, to be exercised by it as a court, in the manner and with the formalities used in its ordinary proceedings, the action of such court is to be regarded as judicial, irrespective of the original nature of the power. The Legislature, by conferring any particular power upon a court, virtually declares that it considers it a power which may be most appropriately exercised under the modes and forms of a judicial proceeding. If, therefore, there were nothing whatever to characterize the proceedings in this case, as in any respect judicial, except that they were had in the exercise of a power conferred upon the Supreme Court as a court, I should not hesitate to hold that they were subject to all the ordinary incidents of other proceedings in courts of justice.

But I regard the nature of the office as of no little importance in determining the question which arises here. In the

cases to which I have referred, the courts have laid stress upon the fact that the commissioners, when appointed, become officers of the court, and, as such, subject to its direction and control. This is an argument which applies with far greater force to the present case. Attorneys and counsellors are not only officers of the court, but officers whose duties relate almost exclusively to proceedings of a judicial nature. And hence their appointment may with propriety be intrusted to the courts, and the latter, in performing this duty, may very justly be considered as engaged in the exercise of their appropriate judicial functions.

By a statute of the State of Missouri, the Supreme Court of that State was authorized to strike from the rolls any attorney guilty of contempt, malpractice, &c. And the Circuit Court was empowered to suspend from practice any attorney guilty of any misconduct which, in the opinion of that court, should be such as to justify his being stricken from the rolls. Under this statute, George Strother, an attorney, was suspended by the Circuit Court of St. Louis county, for six months, by an order entered in the minutes of the court. Strother brought a writ of error to the Supreme Court, and that court sustained the writ, and reversed the order of the Circuit Court. (Strother *a.* The State of Missouri, 1 *Miss. R.*, 605.)

Again, the Supreme Court of the Territory of Minnesota, before its admission as a State, was authorized by a statute of the Territory to remove an attorney for wilful misconduct. Under this law, one David A. Secombe was removed by an order of the court, reciting the cause. Secombe thereupon presented a petition to the Supreme Court of the United States, praying for a mandamus to be directed to the Territorial Court, commanding such court to vacate the order. The mandamus was denied upon the sole ground that the act of removal was a judicial act. Chief Justice Taney said : " We are not aware of any case where a mandamus has issued to an inferior tribunal, commanding it to reverse or annul its decision, when the decision was in its nature a judicial act." (19 *How. U. S. R.*, 15.) If the removal or suspension of an attorney be, as was held, in these cases, a judicial act, it is difficult to see how the admission of an attorney is any the less so ; especially when, as here, the court in the act of admission is required to pass not only upon the sufficiency of the evidence of certain facts, but upon the constitu-

tionality and validity of a statute, and thus to exercise the highest judicial function ever intrusted to a court.

But in addition to the arguments and authorities already presented, there is another consideration which serves, as I think, very conclusively to show that the action of the Supreme Court in this case is not executive but judicial. There are, no doubt, certain governmental powers and functions which, although exercised by a court of justice, would nevertheless be purely administrative in their character. Such, for instance, is the power conferred by the Revised Statutes upon Courts of Common Pleas, to grant licenses for keeping ferries; and such, no doubt, would be a power merely to select and appoint officers with duties having no connection with the courts, and who would not, by their appointment, become in any sense officers of the court appointing them. But there is a marked distinction between such cases and that under review. In the act of licensing ferries, the court does not pass upon a right, but simply exercises a discretion. The statute confers no right to a ferry upon any individual, whatever may be the circumstances. If it did, and the court was authorized to adjudicate as to the existence of the facts entitling the party to the right, its act in so doing would clearly be judicial. In regard to attorneys, the Constitution confers the absolute right of admission upon every one possessing the requisite qualifications. The court is called upon to determine as to the existence of this right. It being ascertained that the applicant possesses the requisite qualifications, his admission follows as a legal necessity. It is certainly clear, as a general rule, that whenever the law confers a right, and authorizes an application to a court of justice to enforce that right, the proceedings upon such an application are to be regarded as of a judicial nature, and I am unable to perceive any just ground upon which the present case can be considered as an exception.

But it does not necessarily follow that the order is appealable. That depends upon the provisions of the Code authorizing appeals to this court. By subdivision 3, of section 11, taken in connection with the previous portions of the section, it is declared that this court shall have jurisdiction to review every actual determination made at a general term of the Supreme Court, " in a final order affecting a substantial right made in a

special proceeding." That the order under review is an actual determination of the court, that it is final, and that it affects a substantial right, will not be doubted. The only question which can arise upon this part of the case is, whether it was made in a "special proceeding."

By section 1 of the Code, remedies in courts of justice are divided into actions and special proceedings. Section 2 defines an action to be an ordinary proceeding, viz., in a court of justice; and section 3, declares that every other proceeding is a special proceeding. As the application in this case could not by possibility be an action, it is of course a special proceeding, provided it is a remedy at all under section 1. What then is a remedy? The only judicial exposition of the subject appears to be that contained in a remark of Johnson, J., in Belknap *a.* Waters (1 *Kern.*, 477). He says: "The Code, unfortunately, has not furnished us a definition of a remedy, except in so far as one can be drawn from its distribution of all remedies into actions and special proceedings. It seems to regard every original application to a court of justice for a judgment or an order as a remedy. According to this interpretation, which I deem just, the application of the appellant to the Supreme Court was clearly a remedy. If we take the definition of the word remedy given by lexicographers, the result is the same. Bouvier defines remedy to be "the means employed to enforce a right, or redress an injury." This definition would clearly embrace the present proceeding; since every applicant has, as we have seen, an absolute constitutional right to admission, provided he is a citizen and of the required age, character, and ability, and the object of the application was to enforce this right.

It becomes our duty, therefore, to review the order of the Supreme Court denying the right of the appellant to admission as an attorney; and in doing so it will be assumed, as the court appears to have assumed, that the only objection to his admission was that upon which his rejection by the court was based, viz.: The unconstitutional nature of the act of April 7, 1860, under which the application was made.

Several objections to the validity of this act are suggested by the Supreme Court. The first is, that it makes the possession by a graduate of the Law School of Columbia College of a

diploma conferring the degree of Bachelor of Laws the only prerequisite of admission to practise, while the Constitution requires that the applicant, to be entitled to such admission, must be a male citizen of the age of twenty-one years.

If the act were necessary to be construed strictly according to its terms, this objection would perhaps prove to be well taken. Interpreted literally and by itself alone, it would seem in effect to declare that any graduate of the Law School, who has obtained a diploma under the circumstances mentioned in the act, shall be admitted to practise, irrespective of age, citizenship, and sex. But a construction which would bring an act of the Legislature into direct and palpable collision with the Constitution, is not to be adopted without imperious necessity. It is never to be presumed that the Legislature has violated the organic law. A strong presumption to the contrary is indeed to be overcome in every case, before a law can, with propriety, be declared unconstitutional. If, by the application of the established rules of statutory construction, it can be so interpreted as to harmonize with the Constitution, this interpretation is to be adopted. One of these rules is, that a statute is to be considered as passed in view of, and is to be construed in connection with, the existing laws on the same subject. Another is, that we are to look at the general scope and design of the law, at the evil to be remedied, or the benefit attained, and so to construe the law as to accomplish the object the Legislature has in view.

The motive for passing the act in question is apparent; Columbia College being an institution of established reputation, and having a Law Department under the charge of able professors, the students in which department were not only subjected to a formal examination by the Law Committee of the institution, but to a certain definite period of study before being entitled to a diploma as graduates, the Legislature evidently, and no doubt justly, considered this examination, together with the preliminary study required by the act, as fully equivalent, as a test of legal acquirement, to the ordinary examination by the court; and as rendering the latter examination, to which no definite period of preliminary study was essential, unnecessary and burdensome.

The act was obviously passed with reference solely to the

learning and ability of the applicant, and for the mere purpose of substituting the examination by the Law Committee of the College for that of the court. It could have had no other object, and hence no greater scope should be given to its provisions. We cannot suppose that the Legislature designed entirely to dispense with the plain and explicit requirements of the Constitution; and the act contains nothing whatever to indicate an intention that the authorities of the College should inquire as to the age, citizenship, &c., of the students, before granting a diploma. The only rational interpretation of which the act admits is, that it was intended to make the college diploma competent evidence as to the legal attainment of the applicant, and nothing else. To this extent alone it operates as a modification of pre-existing statutes, and it is to be read in connection with those statutes and with the Constitution itself, in order to determine the present condition of the law on the subject.

Again, it is suggested that the clause in the act, which makes a previous attendance upon the Law School for a certain definite period an indispensable condition of admission under the provisions of the act, brings it in conflict with the Constitution.

This objection has far less weight than that just considered. The Supreme Court was, no doubt, correct in assuming that the constitutional provision was intended to deprive the courts of all power to require any particular period of study, as a necessary preliminary to admission to the bar; and to confer upon all male citizens of the requisite age, however short may have been their period of study, the right to be admitted, if properly qualified. If the act in question should be found in the slightest degree to have abridged this right, it would be clearly invalid. By no reasonable construction, however, can it be made to have that effect. Students in the Law School are under no obligation to avail themselves of the provisions of the law. The wide door thrown open by the Constitution is in no respect narrowed. They may retire at will from the Law School and present themselves to the court for admission. No privilege, therefore, conferred by the Constitution is taken away or impaired. Those who wish to avail themselves of the additional privilege afforded by the act must comply with its provisions. Although the Legislature cannot limit a right given by the

Constitution, it may surely impose conditions upon privileges granted by itself. This is so plain as to admit of no debate.

But the most serious objection to the law, and that upon which the judgment of the court below was mainly based, is, that the power to appoint or admit attorneys and counsellors is vested exclusively in the courts, and that, in this respect, the act in question is in conflict with the Constitution and void. If such an exclusive power is vested in the courts, it must be derived directly from some specific provision or provisions of the Constitution. It cannot be claimed as a part of the inherent power of the courts, or as resulting necessarily from their organizations as courts. To show this, it is unnecessary to go at length into the history of attorneys and counsellors as a separate class. It will be sufficient briefly to refer to the manner in which, prior to the Constitution of 1846, they had received their appointments both here and in England. Barristers or counsellors at law, in England, were never appointed by the courts at Westminster, but were called to the bar by the Inns of Court, which were voluntary unincorporated associations. The power of the court to appoint attorneys as a class of public officers was conferred originally, and has been from time to time regulated and controlled in England by statute. (4 Hen. IV., ch. 18; 3 Jam. I., ch. 7; 6 & 7 Vict., ch. 73, § 27; 20 & 21, Vict., ch. 77, §§ 40–45.)

In this State, it seems that attorneys, prior to the Revolution, were appointed by the governor of the colony. (People *a.* The Justices of Delaware, 1 *Johns. Cas.*, 182.) By the Constitution of 1777, the power of appointing this class of officers was vested directly in the courts; but the Constitution of 1822 was silent upon the subject, thus leaving the matter in the direction and control of the Legislature, which, at its next session, passed an act requiring attorneys to be licensed by the courts in which they should respectively practise. It is plain, therefore, that although the appointment of attorneys has usually been intrusted in this State to the courts, it has been, nevertheless, both here and in England, uniformly treated not as a necessary or inherent part of their judicial power, but as wholly subject to legislative action. I take no notice of the distinction between attorneys and counsel in the courts of this State, because the same principles in respect to the mode of appointment are, of course, applicable to both.

Matter of the Graduates.

It follows, from what has been said, that unless the Constitution of 1846 has either expressly or impliedly conferred upon the Supreme Court, or upon the several courts, the exclusive power claimed in this case, the whole subject of the admission of attorneys and counsellors was left as theretofore, in the hands of the Legislature, subject only to the constitutional provisions bearing upon it. Let us see, then, whether the exclusive power in question can be fairly derived from any provision of the Constitution. The learned judge, by whom the opinion was delivered in the court below, has attempted to deduce it indirectly from sections 3 and 5 of article 6, which, in effect, organize and establish the Supreme Court, with substantially the same jurisdiction it previously possessed. His argument is that, by the Constitution of 1777, the appointment of attorneys, &c., was given without limitation to the courts; that although the Constitution of 1822 was silent on the subject, the Legislature, in the absence of any constitutional provision, had, by express enactment, continued the power possessed by the courts under the previous Constitution; and that, as the Constitution of 1846 was adopted with full knowledge of the power possessed and exercised by the Supreme Court, the inference is, that it was intended to confirm this power with such modifications and restrictions only as were inserted in the Constitution. He refers to the familiar rule, that a statute which in some measure conflicts with a previous statute, but which it does not in terms repeal, simply abrogates so much of the former statute as is inconsistent with the new enactment, leaving the residue in force; and that the effect of a new constitutional provision upon pre-existing statutes is the same.

In this, the judge is no doubt correct; but his inference that the power thus exercised by the Supreme Court, is thus established so as to be beyond the control of the Legislature, is plainly erroneous. Upon this theory, such parts of our existing statutes as were not abrogated by the new Constitution, would be rendered thereafter unchangeable. The Constitution of 1846 left, it is true, so much of the previous statute on the subject of the admission of attorneys as did not conflict with its provisions in full force, but did not take away the power of the Legislature to alter it. Indeed, the specific provision of the Constitution on the subject of attorneys, in the connection in which it

stands, bears much more the aspect of being designed to take power from the courts than to confer it upon them. The entire section reads as follows: "They (*i. e.* the judges) shall not hold any other office or public trust. All votes for either of them for any elective office except that of justice of the Supreme Court or judge of the Court of Appeals, given by the Legislature or the people, shall be void. *They shall not exercise any power of appointment to public office.* Any male citizen of the age of twenty-one years, of good moral character, and who possesses the requisite qualifications of learning and ability, shall be entitled to admission to practise in all the courts of this State."

The object of this provision is plain. Attorneys, solicitors, &c., were public officers; the power of appointing them had previously rested with the judges, and this was the principal appointing power which they possessed. The convention was evidently dissatisfied with the manner in which this power had been exercised, and with the restriction which the judges had imposed upon admission to practise before them. The prohibitory clause in the section quoted, was aimed directly at this power, and the insertion of the provision respecting the admission of attorneys, in this particular section of the Constitution, evidently arose from its connection with the object of this prohibitory clause. There is nothing indicative of confidence in the courts, or a disposition to preserve any portion of their power over this subject, unless the Supreme Court is right in the inference it draws from the use of the word "admission" in the section referred to. It is urged that the admission spoken of must be by the court; that to admit means to grant leave, and that the power of granting necessarily implies the power of refusing, and, of course, the right of determining whether the applicant possesses the requisite qualifications to entitle him to admission.

These positions may all be conceded without affecting the validity of the act. The Legislature has not taken from the court its jurisdiction over the question of admission, but has simply prescribed what shall be competent evidence in certain cases upon that question. It is not necessary, as seems to have been supposed by the court below, that the power to do this should be especially granted by the Constitution. The general grant of power in section 1, article 3, embraces the entire legis-

lative power of the State, which in itself is absolute and un-
limited. Whether, therefore, the Constitution contains a restric-
tion upon this power in the particular case, is the only question
which can ever arise in respect to any exercise of power by the
Legislature. There are, no doubt, some restrictions upon the
power of the Legislature to prescribe rules of evidence, as other-
wise it might subvert some of the most valuable guaranties
contained in the Constitution. These restrictions have never
been judicially defined, but they clearly do not reach the pres-
ent case.

It will not be doubted, even assuming that the court had the
exclusive power of "admission," that the Legislature might
have provided that the affidavit of the appellant should be
evidence upon the question of age, or the certificate of some
public officer upon that of citizenship. There is no substantial
difference, in respect to the power of the Legislature, between
such cases and that under consideration. The diploma simply
proves that the applicant has the requisite learning and abil-
ity, but leaves the facts in regard to the length of study, the
age, citizenship, &c., of the applicant, to be inquired into and
passed upon by the court in determining the question of ad-
mission.

But I see no good reason for holding that it was intended to
refer even the ultimate act of admission exclusively to the court.
If the Constitution is to be so interpreted, then it is clear that
the Legislature, the legal profession, and even the courts them-
selves, have been greatly in error. The very next Legislature
after the Constitution was adopted, in passing the judiciary act,
assumed that the admission of attorneys and counsellors to prac-
tise, subject to the restrictions contained in the Constitution,
was left as before, in the hands of the Legislature, and its action
in this respect has been uniformly acquiesced in by both bench
and bar. The Supreme Court itself has repeatedly ratified and
confirmed this legislation, as it is by virtue of the judiciary act
alone that it has exercised the power of admitting attorneys and
counsellors to practise in other courts. There can be no pre-
tence that the Constitution invests the Supreme Court alone
with this power. If the construction adopted by the court be-
low is sound, the consequence must, of course, be, that each
court would have a right to admit its own practitioners. It

would be difficult to find any theory in the Constitution which, even by implication, could authorize it to admit attorneys, &c., to practise in the County Courts or in the Court of Appeals.

I do not doubt, however, that the Supreme Court may, with propriety, be invested with this power, notwithstanding the clause which prohibits the judges from exercising any power of appointment to office. The admission of an attorney under the provisions of the present Constitution, is not an appointment. Whenever an applicant is found to possess the requisite qualifications, the Constitution, by its own inherent energy, appoints, *i. e.*, it gives to the applicant an absolute title to the office, which is equivalent to an appointment. The word admission means, no doubt, as it has uniformly been interpreted to mean, something more than merely permitting the appearance of persons who may present themselves in particular cases claiming the right to practise. It is to be understood with reference to the long-established custom of admitting and licensing attorneys, not for a single occasion, but generally; upon any other construction, every practitioner would be obliged to hold himself in readiness, at all times, to prove that he was possessed of the requisite constitutional qualifications, which would be extremely inconvenient and embarrassing to the administration of justice. No doubt some kind of formal admission was contemplated; but so far as I can see, that admission, under the provisions of the Constitution, may as well have been by the governor, the attorney-general, or any other public functionary, as by the courts. There was a propriety, certainly, in investing the courts with the power, as the Legislature has done; but this was a question of mere legislative discretion. My conclusion, therefore, is, that the act under consideration is valid, and hence that the order appealed from should be reversed.

In regard to the constitutional question, all the judges concurred, except COMSTOCK, Ch. J., who also, together with DENIO and WRIGHT, JJ., dissented from that portion of the opinion holding the order in question appealable.

Order reversed.

A similar decision was made in the case of the appeal from the order denying admission to the graduates of the New York University.

The appellants thereupon applied to the court below for admission, who accordingly admitted them, but with the following explanation:

BY THE COURT.—SUTHERLAND, J.—It seems that a reversal of the orders made by this court in May last, denying the applications of these young gentlemen (the former a law student of Columbia College, and the latter of the University of New York) for admission to practise as attorneys and counsellors of this court, under special and recent acts of the Legislature of this State, has been procured from the Court of Appeals.

It seems that the clerk of this court, without any order of this court, made a return to the Court of Appeals, of the orders and proceedings in the matter of these applications, and that the Court of Appeals, on an *ex-parte* application and argument, without notice to the attorney-general, or any other person, have held the acts of the Legislature to be constitutional, reversed the orders of this court, and directed the court to admit these young gentlemen.

When the justices of this court who were sitting in the Court of Appeals in this matter, shall have performed the high duties which the Constitution temporarily consigned to them in that court, and shall have returned to their own court, we shall, no doubt, be informed by them of the peculiar circumstances (if any) which may have induced this (as it appears to us) extraordinary proceeding on the part of the Court of Appeals; but in the mean time, to prevent even the appearance of a want of respect for law and order, this court yields, as to these applicants, to the decision of the Court of Appeals, at the same time respectfully, but earnestly protesting against it, for reasons, and on grounds which will be stated more at large hereafter, and on the understanding that these admissions are not to be considered as at all conclusive as to future applications of a similar character.

On a similar application, subsequently made on behalf of other graduates in the second district (present, LOTT, EMOTT, and BROWN, JJ.), this protest was reviewed upon the argument; and after advisement, the court unqualifiedly granted the application.